**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____

|  |  |
|---|---|
| **LOCAL NO. 8 IBEW RETIREMENT** | ) |
| **PLAN, on behalf of itself and all** | ) |
| **others similarly situated,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **VERTEX PHARMACEUTICALS INC.,** | ) |
| **JOSHUA BOGER, Ph.D., JEFFREY** | ) |
| **LEIDEN, M.D., Ph.D., PETER** | ) |
| **MUELLER, Ph.D., PAUL SILVA,** | ) |
| **ELAINE ULLIAN, and NANCY J.** | ) |
| **WYSENSKI,** | ) |
| | ) |
| **Defendants.** | ) |

Civil Action No.
14-12296-FDS

_____

**MEMORANDUM AND ORDER**
**ON DEFENDANTS' MOTION TO DISMISS**

SAYLOR, J.

This is a putative class action involving alleged violations of the Securities Exchange Act

of 1934 and Rule 10b-5.  Local No. 8 IBEW Retirement Plan has brought suit, on behalf of a

class of similarly situated persons, against Vertex Pharmaceuticals Inc. and various Vertex

executives.  Plaintiff contends that class members were harmed when they purchased Vertex's

common stock at prices that were artificially inflated by the company's false and misleading

statements about its products.  Plaintiff also contends that a number of Vertex executives

personally profited by selling millions of dollars of Vertex stock while the stock's value was

artificially inflated.

Defendants have filed a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) on the

ground that the complaint fails to state a claim under the heightened pleading requirements for

actions alleging securities fraud.  It is essentially undisputed that Vertex made a false statement

on May 7, 2012, when it released the interim results of a Phase II clinical study concerning a

combination therapy for cystic fibrosis.  For purposes of the motion to dismiss, Vertex also does

not dispute that the false statement was material.  The only issue is whether the complaint pleads

sufficient facts to give rise to a "strong inference" of scienter, as required by law.  For the

reasons set forth below, defendants' motion will be granted.

## I.      Background

Unless otherwise noted, all facts are stated as set forth in the complaint.[1]

### A.      Factual Background

Vertex is a biotechnology company that researches, develops, and commercializes

pharmaceuticals to treat a variety of illnesses.  (Compl. ¶¶ 3, 20).  The company's products

include treatments for hepatitis C, HIV, and cancer.  (*Id*. ¶¶ 3, 20).  At the relevant time, Vertex

was based in Cambridge, Massachusetts.  (*Id*. ¶¶ 12, 20).

Joshua Boger, Ph.D., founded Vertex in 1989.  (*Id*. ¶¶ 3, 13).  He was formerly the Chief

Executive Officer and Chairman of the Board; in 2012, he was serving as a Director.  (*Id*. ¶ 13).

Jeffrey Leiden, M.D., Ph.D., was the President and Chief Executive Officer of Vertex.  (*Id*. ¶

14).  Peter Mueller, Ph.D., was the Executive Vice President of Global Research &

Development.  (*Id*. ¶ 15).  Elaine Ullian was the co-lead independent director.  (*Id*. ¶ 17).  From

2008 to April 2011, Paul Silva served as Vice President and Corporate Controller.  (*Id*. ¶ 16).

---

[1]  While ordinarily "any consideration of documents not attached to the complaint, or not expressly
incorporated therein, is forbidden . . . courts have made narrow exceptions for documents the authenticity of which
are not disputed by the parties; for official public records; for documents central to plaintiffs' claim; or for documents
sufficiently referred to in the complaint."  *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993).  *See Mississippi Pub.
Employees' Ret. Sys. v. Boston Scientific Corp.*, 523 F.3d 75, 86 (1st Cir. 2008).

From December 2009 to June 2012, Nancy J. Wysenski was Chief Commercial Officer and Executive Vice President.  (*Id*. ¶ 18).

One of Vertex's products is the drug Kalydeco, which was approved by the Food and Drug Administration for use in treating cystic fibrosis in early 2012.  (*Id*. ¶¶ 4, 22).

Cystic fibrosis is a disease that causes the body to produce abnormal amounts of mucus in the lungs and the pancreas.  (*Id.* ¶ 23).  It typically results in life-threatening lung infections and digestion problems.  (*Id*.).  Approximately 30,000 people in the United States have cystic fibrosis.  (*Id*.).  Currently, there is no cure for the disease.  (*Id*.).

Cystic fibrosis is a genetic disease.  (*Id*.).  It is caused by mutations that affect a particular protein, so that, among other things, the protein does not properly regulate the movement of chloride in and out of the lungs.  (*Id*. ¶ 24).  The majority of cases involve the "F508del" mutation.  (*Id.*).  Approximately four percent of cases involve the "G551D" mutation.  (*Id*. ¶¶ 22, 24).

In January 2012, Vertex received FDA approval for use of Kalydeco with patients who had the G551D mutation.  (*Id*. ¶ 22).  In early 2012, Vertex also began exploring the combination of Kalydeco with another medication, VX-809.  (*Id.* ¶¶ 22, 24).

Vertex began its Phase II trial of VX-809 and Kalydeco in combination by enrolling 108 patients for the study.  (*Id.* ¶ 25).  Patients were asked to cease their antibiotic treatments, as most cystic fibrosis patients cycle antibiotics and tend to deteriorate when off the antibiotics. (*Id*.).  Varying dosages of VX-809 were given to patients for 28 days, followed by Kalydeco for 28 days.  (*Id*.).  The control group received placebo pills during the entire 56-day period.  (*Id.*)

On May 7, 2012, Vertex announced in a press release that it had achieved significant

"interim results" in the Phase II clinical study that combined VX-809 and Kalydeco.  (*Id*. ¶ 28;

Sylvia Aff. Ex. A).[2]  The press release stated that "approximately 46 percent (17/37) [of patients]

experienced an *absolute* improvement from baseline to Day 56 in lung function of 5 percentage

points or more," and that "approximately 30 percent (11/37) experienced an *absolute*

improvement from baseline to Day 56 of 10 percentage points or more."  (Compl. ¶ 28)

(emphasis added).  The press release also noted that in comparison, none of the patients treated

with placebo achieved an improvement of five percentage points or more.  (*Id*.).  The press

release included information about sweat chloride levels and stated that the "reductions were not

statistically significant."  (*See* Sylvia Aff. Ex. A at 3).[3]

Vertex held a conference call with analysts on May 7.  (Compl. ¶ 30).  During the call,

Mueller, the Chief Scientific Officer, remarked that he had "never seen anything like this" and

called the results "really fantastic."  (*Id*. ¶ 30).  Leiden, the Chief Executive Officer, remarked

that Vertex's hepatitis C drug and Kalydeco had provided significant cash flows to the company

and indicated that it would "accelerate" its investment into the next stage.  (*Id*. ¶ 31).  Wysenski,

the Chief Commercial Officer, said that the potential market for the treatment was 70,000

---

[2] "Before presentation of a new drug to the FDA, pharmaceutical companies are required to engage in three phases of clinical trials, with each phase growing in complexity and size, before ultimate presentation to the FDA. Phase 1 consists of a closely monitored, relatively small study (twenty to eighty volunteers) to determine the safety of the drug and, if possible, early evidence of effectiveness.  *See* 21 C.F.R. § 312.21(a).  Phase 2 involves further clinical research and study to determine the drug's efficacy and any 'common short-term side effects and risks associated with the drug.'  *Id.* § 312.21(b).  Finally, Phase 3 clinical trials 'are performed after preliminary evidence suggesting effectiveness of the drug has been obtained' and usually include 'several hundred to several thousand subjects.'  *Id.* § 312.21(c)."  *Kleinman v. Elan Corp., plc*, 706 F.3d 145, 148 (2d Cir. 2013).

[3] According to the complaint, measurements of sweat chloride levels are the "gold standard" for research on cystic fibrosis.  (Compl. ¶¶ 26, 42).  The complaint alleges that Vertex focused in the statements at issue here on an alternative potential marker for effectiveness known as FEV1.  (*See id.* ¶ 26).  FEV1 assesses lung function by measuring a person's forced expired volume during one second of exhalation.  (*Id.*).

patients, which would amount to billions of dollars of potential sales. (*Id.*).[4]

At the end of the day on May 7, Vertex's stock price, which had closed at $37.41 per share on May 4, closed at $58.12 per share. (*Id.* ¶ 34). Trading volume that day was 40 times the average. (*Id.*). In the subsequent weeks, the company's stock price climbed as high as $64.94. (*Id.* ¶ 35).

The complaint alleges that defendants "turned a blind eye" to the likelihood that the released results were "too good to be true." (*Id.* ¶ 40). According to a confidential witness ("CW2") who was a Vertex senior director from 2004 to June 2012, the company had the results for two weeks prior to releasing them; the results "would have been sent" to defendant Wysenski and others, and a committee of executives "met to review the results to determine whether the information was material and warranted release." (*Id.* ¶ 41).[5] Another witness ("CW1"), who worked at Vertex prior to 2012, states that some employees were highly skeptical of the results because there was a noted lack of sweat chloride improvement and the data announced on May 7, 2012 was just "too beautiful" and needed to be checked. (*Id.* ¶ 42). Another witness ("CW3"), who was an analytical development employee from October 2011 to October 2012, asserts that people within Vertex knew that VX-809 made Kalydeco "work less well." (*Id.* ¶ 43).

Between May 7 and May 23, 2012, Boger, Mueller, Silva, Ullian, and Wysenski

---

[4] The following day, Chief Financial Officer Ian Smith reiterated that the company was planning to accelerate the development of the combination treatment and was in discussions with the U.S. Food and Drug Administration and European authorities. (Compl. ¶ 33).

[5] Under the PSLRA, a plaintiff may rely on a confidential witness and need not provide his or her name as long as the witness is "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *New Jersey Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.*, 537 F.3d 35, 51 (1st Cir. 2008). Courts must evaluate such witnesses based on factors such as "the level of detail provided by the confidential sources, the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia." *Id.*

collectively sold more than 539,000 shares of Vertex for $31.9 million.  (*Id.* ¶¶ 35, 71; *see* Sylvia

Aff., Exs. G, H, I).[6]  The complaint alleges that the individual defendants' stock sales "were

especially unusual when compared to their trading history before and after the Class Period."

(Compl. ¶ 38).

Wysenski alone sold approximately 180,000 shares for more than $10 million on May 7

and 8 and 180,000 shares for more than $11.5 million on May 14.  (Compl. ¶ 71).  The complaint

alleges that she "did not make stock sales even close to that magnitude in her entire tenure at

Vertex."  (*Id.* ¶ 35).  According to the complaint, on June 8, 2012, Vertex "suddenly and without

any forewarning," announced her retirement.  (Compl. ¶ 37).  She was 54 years old at the time.

(*Id.*).  The complaint alleges that her retirement was announced just "one day after [Iowa Senator

Charles Grassley] complained [to the SEC] about her massive and suspicious stock sales."  (*Id.*).[7]

The complaint also alleges that on May 7, Mueller sold $4 million in stock, which was

"uncharacteristic of his trading pattern."  (*Id.*).[8]  Plaintiff has included a color-coded chart in the

complaint that purports to show the trading history of the individual defendants for calendar year

2012.  (*Id.* ¶ 38).  The chart is difficult to read, but displays a clear and substantial spike in

---

[6] According to defendants, seven of the ten separate sales made by defendant insiders during that period were made pursuant to approved Rule 10b5-1 plans.  (Def. Mem. at 6, 19).

[7] According to defendants, Wysenski exercised options and sold stock because she had been planning to (and did) retire in June 2012.  (Def. Mem. at 18; *see* Sylvia Aff. Ex I).

[8] According to defendants, Leiden did not trade at all during the class period.  (Def. Mem. at 18).  In addition, defendants point out that "although the . . . [c]omplaint compares the frequency of each defendant's trades during the class period with his or her trading activity during the rest of 2012, it does not (with one exception) put the *size* of those trades into context by comparing them to each defendant's total holdings of Vertex stock."  (Def. Mem. at 18).  For example, although Boger sold 11,314 shares during the class period, those transactions accounted for less than two percent of his holdings.  (*Id.*).  In addition, with respect to Boger, he sold 11,314 shares during the class period.  That breaks down to 3,314 shares on May 9, 4,000 shares on May 16, and 4,000 shares on May 23. (Compl. ¶ 71).  He also sold 4,000 shares of stock on May 2, and another 4,000 shares of stock on May 30.  (Def. Mem. at 19; *see* Sylvia Aff. Ex. J).  Boger's trading of stocks appears to be consistent throughout most of 2012. (Compl. ¶ 38).

insider sales during early May, apparently including sales by Boger, Ullian, and Silva as well as Wysenski and Mueller.

At the time of the May 7 press release, Local No. 8 IBEW Retirement Plan had not yet purchased Vertex stock.  Local No. 8 purchased 2,282 shares of Vertex common stock on May 14, 2012, and 871 shares of stock on May 23, 2012.  (*Id.*, Sched. A).  It paid $64.56 per share for 1,175 shares, $64.41 per share for 1,107 shares, $62.74 per share for 760 shares, and $62.09 per share for 111 shares.  (*Id.*).

On May 29, 2012, Vertex issued a statement correcting the May 7 press release.  The new disclosure explained that the data concerning improvement in lung function for patients was "relative" rather than "absolute."  (Compl. ¶¶ 39, 46, 47; *see* Sylvia Aff. Ex. B).  According to the company, the results were still statistically significant but less dramatic.  (Sylvia Aff. Ex. B at 1).  During a conference call that day, Vertex attributed the error to a "misinterpretation between Vertex and [its] outside statistical vendor concerning the type of responder analysis performed."   (Compl. ¶¶ 47, 50).

According to two confidential witnesses, CW1 and CW2, a Vertex employee received the raw data and should have realized that the data was "suspect." (Compl. ¶¶ 41, 48).  Thus, according to the complaint, the error actually occurred within Vertex, not with the vendor. (Compl. ¶ 49).

On the May 29 news, the stock price fell from a close of $64.85 on May 25, 2012 to a close of $57.80 on May 29, 2012.  (Compl. ¶ 50).  According to the complaint, the price change represented the "stock's greatest decline in three years."

According to defendants, in January 2013, the FDA granted the combination therapy a

"Breakthrough Therapy Designation" based on the Phase II trial results.  (Def. Mem. at 5-6).

"Vertex went on to conduct pivotal Phase 3 studies of Kalydeco and VX-809, and in November

2014, after the results of the trials showed significant improvements in lung function and other

'endpoints,' Vertex submitted a New Drug Application to the FDA for the combined therapy."

(Def. Mem. at 6).

### B.    <u>Procedural Background</u>

Vertex and its executives were previously sued by the City of Bristol Pension Fund for

alleged violations that overlap with the allegations in the present case.  *See City of Bristol*

*Pension Fund v. Vertex Pharmaceuticals, Inc.* 12 F. Supp. 3d 225 (D. Mass. 2014).  The City of

Bristol Pension Fund brought suit on September 6, 2012, on behalf of all purchasers of Vertex

common stock between May 7, 2012, and June 28, 2012.  *Id.*  Although it was undisputed that

Vertex made a false statement on May 7, 2012, Bristol did not purchase stock until after Vertex

corrected the statement on May 29.  *Id.*  As a result, the Court concluded that plaintiff was

without standing to assert claims arising out of the May 7 statement.  *Id.*  With respect to any

lingering effects of the May 7 statement in the period after Bristol purchased stock, plaintiff

failed to show that subsequent statements were materially misleading or made with scienter.  *Id.*

As a result, on March 31, 2014, the case was dismissed.  *Id.*[9]

On May 28, 2014, Local No. 8 filed a complaint on behalf of all purchasers of Vertex

common stock between May 7, 2012, and May 29, 2012.  The complaint alleges that Vertex and

the individual defendants violated Section 10(b) of the Securities Exchange Act of 1934 and

---

[9] On May 23, 2014, a motion to clarify and amend the judgment, to permit the filing of a second amended complaint, and to allow Local No. 8 to intervene was denied.  *City of Bristol Pension Fund*, No. 12-cv-11654, Docket No. 67 (D. Mass. May 23, 2014).

Securities and Exchange Commission Rule 10b-5; that the individual defendants violated

Section 20(a) of the 1934 Act; and that defendants Boger, Mueller, Silva, Ullian, and Wysenski

violated Section 20A of the 1934 Act.

Defendants have moved to dismiss the complaint under Fed. R. Civ. P. 12(b)(6) for

failure to state a claim upon which relief can be granted.

## II.  <u>Legal Standard</u>

On a Rule 12(b)(6) motion to dismiss a claim brought under Section 10(b) and Rule 10b-

5, courts must, as with any such motion, accept plaintiff's allegations as true.  *Tellabs, Inc. v.*

*Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).  However, Congress has raised the

standard of pleading for Section 10(b) and Rule 10b-5 securities fraud claims.[10]  When a plaintiff

alleges misrepresentation or omission of a material fact, the Private Securities Litigation Reform

Act of 1995 ("PSLRA"), Pub. L. No. 104-67, 109 Stat. 737, requires that the complaint "specify

each statement alleged to have been misleading [and] the reason or reasons why the statement is

misleading."  15 U.S.C. § 78u-4(b)(1).  To plead scienter, the complaint must "with respect to

each act or omission . . . state with particularity facts giving rise to a strong inference that the

defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).  A strong inference is

"more than merely plausible or reasonable—it must be cogent and at least as compelling as any

opposing inference of non-fraudulent intent."  *Tellabs*, 551 U.S. at 314.

In evaluating the adequacy of a complaint, a court "cannot hold plaintiff to a standard

---

[10] "In 1995, Congress enacted legislation attempting to wrest control over securities fraud class action lawsuits from the plaintiffs' bar devoted to such litigation and confer it upon counsel for larger institutional investors.  Such a measure, it was believed, would cut down on frivolous litigation as counsel for institutional investors were thought to take a more balanced cost-benefit view of such litigation.  While at it, Congress raised the hurdle a plaintiff would have to jump before being permitted to present her case to a jury."  *Lirette v. Shiva Corp.*, 27 F. Supp. 2d 268, 271 (D. Mass. 1998) (internal citations omitted).

that would effectively require them, pre-discovery, to plead evidence." *Mississippi Pub. Employees' Ret. Sys. v. Boston Scientific Corp.*, 523 F.3d 75, 90 (1st Cir. 2008) (*quoting Shaw v. Digital Equipment Corp.*, 82 F.3d 1194, 1225 (1st Cir. 1996)).  Courts should look at the complaint "as a whole" and weigh "competing inferences" in a "comparative evaluation" of plaintiff's allegations and alternative inferences from those allegations. *ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 59 (1st Cir. 2008); *see also Tellabs*, 551 U.S. at 314.  If "there are equally strong inferences for and against scienter," then the tie goes to the plaintiff. *New Jersey Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.*, 537 F.3d 35, 45 (1st Cir. 2008) (*quoting ACA Fin.*, 512 F.3d at 59).

**III.**     **Analysis**

**A.**     **Rule 10b-5 Generally**

Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b).  Pursuant to that section, the SEC promulgated Rule 10b–5, which makes it unlawful:

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.  Section 10(b) requires proof of six elements:  "(1) a material

misrepresentation or omission; (2) scienter, or a wrongful state of mind; (3) a connection with

the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation."

*Mississippi Pub. Employees' Ret. Sys. v. Boston Scientific Corp.*, 649 F.3d 5, 20 (1st Cir. 2011)

(*quoting City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Waters Corp.*, 632 F.3d

751, 756 (1st Cir. 2011)).

Again, there is no dispute that the May 7 press release inaccurately reported the interim

results in the Phase II clinical study in terms of "absolute" improvement in lung function, when

the data given actually reflected "relative" improvement.  Furthermore, for the purposes of the

motion to dismiss, there is no dispute that the discrepancy was material.  The only issue is

whether the complaint states with particularity facts that give rise to a strong inference of

scienter.

### B.   Allegations of Scienter

To be actionable, a statement must not be merely material and misleading; it also must

have been made with the requisite scienter.  *ACA Fin.*, 512.3d at 58.  "Scienter is 'a mental state

embracing intent to deceive, manipulate, or defraud.'"  *Id.* (quoting *Ernst & Ernst v. Hochfelder*,

425 U.S. 185, 193 n.12 (1976)).

To establish scienter, the pleaded facts must give rise to a "strong inference" that the

defendant had actual knowledge that the representation or omission was misleading.  15 U.S.C.

§§ 78u-4(b)(2)(A), (f)(10)(A).  Scienter "should be evaluated with reference to the complaint as

a whole rather than to piecemeal allegations."  *ACA Fin.*, 512 F.3d at 59.  "It does not suffice

that a reasonable factfinder plausibly could infer from the complaint's allegations the requisite

state of mind."  *Tellabs, Inc.*, 551 U.S. at 314.  Instead, the court must "engage in a comparative

evaluation" and weigh "competing inferences" to determine whether the inference of scienter is "cogent and compelling." *Id.* at 314, 324.  A "'strong inference' of scienter 'must be more than merely plausible or reasonable—it must be cogent and *at least as compelling as any other opposing inference* of nonfraudulent intent.'  In other words, where there are equally strong inferences for and against scienter, *Tellabs* now awards the draw to the plaintiff." *ACA Fin.*, 512 F.3d at 59 (citations omitted) (quoting *Tellabs*, 551 U.S. at 2504-05).

"In this circuit, a plaintiff may satisfy the scienter requirement with a showing of either conscious intent to defraud or 'a high degree of recklessness.'" *Id.* (quoting *Aldridge*, 284 F.3d at 82); *see also Mississippi Pub. Employees' Ret. Sys.*, 649 F.3d at 20 ("Scienter is an intention to deceive, manipulate, or defraud." (internal quotation marks omitted)).  "Recklessness in this context means 'a highly unreasonable omission, involving not merely simple, or even inexcusable[] negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious the actor must have been aware of it.'" *Mississippi Pub. Employees' Ret. Sys.*, 649 F.3d at 20 (quoting *SEC v. Fife*, 311 F.3d 1, 9-10 (1st Cir. 2002)).  "Even if plaintiffs wish to prove scienter by 'recklessness,' they still must allege with sufficient particularity, that defendants had full knowledge of the dangers of their course of action and chose not to disclose those dangers to investors." *Maldonado v. Dominguez*, 137 F.3d 1, 9 n.4 (1st Cir. 1998).[11]

"There is no set pattern of facts that will establish scienter; it is a case-by-case inquiry." *ACA Fin.*, 512 F.3d at 66.  Compelling evidence of scienter most often includes "clear

---

[11] It is also well-established that "[p]leading 'fraud by hindsight,' essentially making general allegations 'that defendants knew earlier what later turned out badly,' is not sufficient." *Ezra Charitable Trust v. Tyco Int'l, Ltd.*, 466 F.3d 1, 6 (1st Cir. 2006) (quoting *Gross v. Summa Four, Inc.*, 93 F.3d 987, 991 (1st Cir. 1996)).

allegations of admissions, internal records or witnessed discussions" that suggest that defendants were "aware that they were withholding vital information or at least were warned by others that this was so" when they made the misleading statements.  *In re Boston Scientific Corp. Sec. Litig.*, 686 F.3d 21, 31 (1st Cir. 2012).  In addition, courts have "considered many different types of evidence as relevant to show scienter," including

> insider trading . . . ; closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information; evidence of bribery by a top company official; existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit; disregard of the most current factual information before making statements; disclosures of accrual basis in a way which could only be understood by a sophisticated person with a high degree of accounting skill; the personal interest of certain directors in not informing disinterested directors of impending sale of stock; and the self-interested motivation of defendants in the form of saving their salaries or jobs.

*Greebel v. FTP Software, Inc.*, 194 F.3d 185, 196 (1st Cir. 1999) (citations omitted).  In addition, various other "facts and circumstances indicating fraudulent intent—including those demonstrating motive and opportunity"— may also combine to satisfy the scienter requirement. *In re Cabletron Systems, Inc.*, 311 F.3d 11, 39 (1st Cir. 2002).  The "presence of [contemporaneous] insider trading can be used, in combination with other evidence, to establish scienter." *Biogen IDEC Inc.*, 537 F.3d at 55.  However, "[i]nsider trading cannot establish scienter on its own, but rather can only do so in combination with other evidence." *Mississippi Pub. Employees' Ret. Sys.*, 649 F.3d at 29.

Plaintiff's theory of scienter here has two components:  first, that the results released to the public were "too good to be true," and that defendants "turned a blind eye" to whether they were accurate or not; and second, that various insiders sold large amounts of stock after the price rose in the wake of the inaccurate announcement.  There is no doubt that those allegations are

plausible, or even that they could support some inference of scienter. The question, however, is whether they support a "strong inference" of scienter as the law requires.

### 1.   The Release of the Test Results

The central allegation of the complaint is that the individual defendants were willfully blind to the possible inaccuracy of the original test results: that the study results were "too good to be true," and that defendants, rather than checking the results of the tests, "turned a blind eye, accepting and promoting unlikely data that offered them a windfall on the sale of their stock." (Compl. ¶ 40).   The complaint further alleges that "[b]y recklessly publishing suspect test results, [d]efendants were able to buoy the share prices of Vertex which had just recently massively declined due to competition from other producers of Hepatitis C medications." (*Id.*). "During the spike in the stock prices resulting from the false and misleading statements, the [i]ndividual [d]efendants . . . then rushed to sell off enormous amounts of stock for immense personal gains." (*Id.*).

The complaint alleges that "[d]esperate to prove itself after Hepatitis C losses, and to provide a vehicle for the [c]ompany's senior officers and directors to cash in on sales of their stock, [d]efendants issued preliminary results" of the Phase II testing of the combination of the experimental drug VX-809 and Kalydeco to treat CF patients with homozygous F508del genes in order "to allow Vertex to fast-track its CF study." (Compl. ¶ 28).   In a May 7, 2012 press release, Vertex announced it "had achieved strikingly successful results in its clinical Phase 2 study." (*Id.*).   It reported its results in terms of "absolute improvement" instead of "relevant improvement." (*Id.*).   Vertex executive Christopher Wright was quoted as saying the results "exceeded our expectations." (*Id.* ¶ 29).   In describing the lung improvement data during a May

14

7 conference call, Mueller stated that he "ha[d] never seen anything like this." (*Id.* ¶ 30).

Leiden stated that Vertex was "very pleased to have obtained these results" and that "[p]ending

final data this summer and discussions with regulators, [Vertex] looks forward to accelerating

the development of [its] CF combination regiment for homozygous Delta 508 CF patients." (*Id.*

¶ 31).  During the conference call, Wysenski "reminded analysts that the unserved market for

patients who are homozygous and stood to benefit from this combination product exceeded

70,000 patients, a market involving billions of dollars of potential sales." (*Id.*).  Vertex vice

president Michael Partridge stated that the "early data exceeded our expectations and have

accelerated the plans for this development program.  These data allow us to move forward

quickly with the next step . . . ." (*Id.* ¶ 32).  On a call the next day, CFO Ian Smith stated that

"[t]hat is what drove us to the announcement—the acceleration of the program, and the data

being beyond our expectations to drive as quickly into a phase III program with the confidence

to run a phase III program around an FEV end point." (*Id.* ¶ 33).

The complaint contains no specific allegations (whether from a confidential witness, a

document, or otherwise) that any defendant actually *knew* that the statements were false.

Lacking evidence of actual knowledge, a plaintiff may seek to prove scienter by proving

recklessness.  But it "still must allege, with sufficient particularity, that defendants had full

knowledge of the dangers of their course of action and chose not to disclose those dangers to

investors."  *In re PLC Sys., Inc. Sec. Litig.*, 41 F. Supp. 2d 106, 114 (D. Mass. 1999) (*citing

Maldonado v. Dominguez*, 137 F.3d 1, 9 n.4 (1st Cir. 1998)).

Through three confidential witnesses, the complaint alleges that Vertex had access to the

results for two weeks prior to the press release (Compl. ¶ 41); that unnamed individuals at

15

Vertex "were *highly* skeptical of the applicable study because there was a noted lack of sweat chloride improvements" (*Id.* ¶ 42) (emphasis in original); and that "it was actually known 'for some time' within Vertex that VX-809 . . . decreased the effectiveness of Kalydeco" (*Id.* ¶ 43). According to the complaint, the "results would have been sent to . . . Wysenski among others, through the normal course of business." (*Id.* ¶ 41)).  In addition, "a committee of Vertex executives met to review the results to determine whether the information was material and warranted release." (*Id.*).  It alleges that "[t]herefore, [d]efendants had access to the study results prior to their release and should have known, or at least verified, that the suspect results were unrealistic and unreliable." (*Id.*).  It also alleges that "the data announced on May 7, 2012 was just 'too beautiful' and [d]efendants would have known that the results were out of the ordinary and needed to be checked." (*Id.* ¶ 42).  It alleges that "[d]efendants could easily have confirmed the percentage improvement calculations reported by Vertex's vendor simply by reviewing the results actually reported, patient by patient." (*Id.* ¶ 43).

The principal problem with the complaint is that the "cogent and compelling inference" arising out of those factual allegations is that the defendants were negligent.  Again, although the complaint alleges that defendants had the results for two weeks before publishing the press release, there are no allegations that any individual defendants actually *knew* anything.  Rather, the complaint alleges—in a conclusory fashion—that because defendants had access to the study results prior to their release, they "should have known, or at least verified, that the suspect results were unrealistic and unreliable." (Compl. ¶ 41).

The complaint seeks to bolster that inference by alleging that "[d]efendants could easily have confirmed the percentage improvement calculations reported by Vertex's vendor simply by

reviewing the results actually reported, patient by patient."  But aside for Wysenski, the

complaint contains no allegations that any specific defendant actually had access to the raw data

(as opposed to the results).  And it includes no allegations explaining the factual basis for the

assertion that defendants could "easily" have reviewed the results actually reported.  Indeed,

from the complaint, it is unclear whether such a review would have readily identified the error.

The complaint alleges that "the individual at Vertex tasked with receiving the raw data, a

pulmonologist by trade, should have known about the suspect nature of the data, regardless of

how it was presented by the vendor." (Compl. ¶ 48).  But that suggests not only that the

reporting of the error was the result of a mistake, but that the mistake was not caught by a trained

specialist.  The complaint fails to allege, at least with any specificity, that any of the individual

defendants had the responsibility to check the reported results or that they had the ability to

detect the discrepancy if they did conduct such a review.

The allegation that the sweat chloride levels should have been a "red flag" is contradicted

to a considerable extent by the fact that the test results remained very positive even after the

correction.  Although the results were erroneously reported in terms of absolute improvement

rather than relative improvement, after correction, the number of patients that experienced an

absolute improvement of five percent dropped from 17 to 13, and the number of patients that

experienced an absolute improvement of ten percent dropped from 11 to 7.  The fact that the

results were still impressive is bolstered by the FDA granting the combination therapy a

"Breakthrough Therapy Designation" based on the Phase II trial results in January 2013.  (Def.

Mem. at 5-6).  "Vertex went on to conduct pivotal Phase 3 studies of Kalydeco and VX-809, and

in November 2014, after the results of the trials showed significant improvements in lung

functions and other 'endpoints,' Vertex submitted a New Drug Application to the FDA for the combined therapy." (*Id.* at 6).[12]  Therefore, the allegation that the results were "too good to be true" is not entirely supported by the record.[13]

Plaintiff relies on *In re VeriFone Holdings, Inc. Securities Litigation*, 704 F.3d 694 (9th Cir. 2012), and *In re Carter's Securities Litigation*, 2012 WL 3715241 (N.D. Ga. Aug. 28, 2012), in support of its contention that the requisite standard has been met.  In *In re VeriFone Holdings*, investors filed a securities fraud class action against VeriFone Holdings, Inc. and two executives, alleging that in the aftermath of a merger with Lipman Electronic Engineering Ltd., Verifone reported inaccurate financial statements in three consecutive quarters.  704 F.3d 694.  In the aftermath of the merger, "VeriFone's preliminary internal reports accurately showed it had fallen short of its earnings and gross margins projections." *Id.* at 698.  "Three consecutive times, VeriFone's CEO and CFO supervised accounting staff as they made baseless multimillion-dollar adjustments that brought reported results in line with expectations." *Id.* "Each time, the CEO and CFO accepted the adjustments without question, representing publicly that a recent merger was driving the company's success even as the adjustments grew in size and negatively impacted key metrics." *Id.*  The Ninth Circuit found that the "allegations, viewed holistically g[a]ve rise to a strong inference that" the CEO, CFO, and VeriFone "were deliberately reckless to the truth or falsity of their statements regarding VeriFone's financial results, particularly gross margin percentages." *Id.* at 708.  It determined that it "defie[d]

---

[12] The stock price movement reflects that fact.  Prior to the press release, the stock hovered around $33 per share.  After the press release the stock spiked to approximately $65.  After the correction, the stock dropped to approximately $58, not back to $33.

[13] The allegations of motive based on the poor results of the Hepatitis C drug add little, if any, weight to the allegations.  Companies always have a motive to increase their stock prices, whether they are struggling or not.

common sense that for three straight quarters following a merger, when preliminary reports came in substantially below expectations and the acquired company had lower margins, the correct 'adjustments' to flash reports also happened to be the precise amounts" the CEO and CFO "had identified as necessary to hit earnings targets." *Id.* at 709. "In the face of repeated such adjustments, the company cannot simply close its eyes with a sigh of relief." *Id.* The complaint contained detailed allegations that the CEO and CFO "were hands-on managers with respect to operational details and financial statements, and that they would have been aware of the complications associated with the Lipman merger." *Id.* at 710.

In *In re Carter's, Inc. Securities Litigation*, 2012 WL 3715241 (N.D. Ga. Aug. 28, 2012), a class action was filed "against Carters, Inc., certain Carter's officers and directors, and Carter's outside auditor [PricewaterhouseCooper LLP], for an alleged fraudulent financial 'smoothing' scheme involving the improper 'booking' of accommodations." *Id.* at *1.[14] The Northern District of Georgia examined whether the complaint adequately pleaded scienter against PricewaterhouseCoopers. *Id.* at *1. Based on the magnitude and materiality of the Carter's fraud, violations of Generally Accepted Accounting Principals and Generally Accepted Auditing Standards, failure to perform basic auditing practices and tests, and the disregarding of "several specific 'red flags' that would have placed a reasonable auditor on notice that Carter's was engaged in wrongdoing to the detriment of its investors," the court determined that the totality of the allegations raised a strong inference of reckless malfeasance on the part of PricewaterhouseCoopers. *Id.* at *2-*7.

---

[14] Plaintiff cites *In re Carter's* as a First Circuit case. (Opp. at 13-14 ("This case is also analogous to the recent First Circuit case of *In re Carter's, Inc.* . . . There, although as to an auditor, the First Circuit found . . . .")). The case was actually decided by the Northern District of Georgia.

The allegations here fall far short of those in *Verifone* and *Carter's*.  Unlike in *Verifone*, defendants did not respond to disappointing numbers by having adjustments made that brought the numbers in line with expectations.  There are no allegations that defendants oversaw or took part in any adjustments of the preliminary results prior to release from the public.  Rather, the allegations in this case are that defendants should have questioned the *initial* results because they were too impressive.  Likewise, and unlike *Carter's*, the allegations here lack details as to why the error should have been obvious to defendants or how they could have caught it, and there are no allegations that the defendants failed to perform their basic job responsibilities.

In short, there is little doubt that the complaint alleges a claim of negligence.  But those allegations, without more, do not rise to the level of an "extreme departure from the standard of ordinary care" that "presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious the actor must have been aware of it."  *Mississippi Pub. Employees' Ret. Sys.*, 649 F.3d at 20.

### 2.      Insider Sales

This case would present a relatively easy case for dismissal if it were not for the allegations of insider trading.  The complaint alleges that five executives collectively sold more than 539,000 shares of Vertex stock for $31.9 million during the relevant period and that the stock sales "were especially unusual when compared to their trading history before and after the Class Period."  Plaintiffs allege, in substance, that the allegations of insider sales is sufficient, in combination with the claimed recklessness in reporting the test results, to raise a strong inference of scienter.

As noted, "[i]nsider trading cannot establish scienter on its own, but rather can only do so

in combination with other evidence."  *Mississippi Pub. Employees' Ret. Sys.*, 649 F.3d at 29; *see*

*also Biogen IDEC*, 537 F.3d at 55 ("If there is reason to be concerned about material omissions

or misrepresentations, the presence of insider trading can be used, in combination with the other

evidence to establish scienter."); *Greebel*, 194 F.3d at 198 ("We similarly caution that mere

pleading of insider trading, without regard to either context or the strength of the inference to be

drawn, is not enough.").  To examine the significance of the insider trading, it is necessary to

determine whether there are any available "plausible" and "nonculpable" inferences to be drawn

from the trading behavior.  *See Tellabs*, 551 U.S. at 324.

Plaintiff alleges that five of the six individual defendants (all but Leiden) "collectively

sold tens of millions of dollars in stock immediately following the announcement."  (Compl. ¶

35).  The lion's share of those sales were by Wysenski, who sold more than $21.5 million worth

of shares beginning on May 7, the date of the announcement.  The complaint alleges that the

sales activity prompted Senator Grassley to write a letter to the chair of the SEC on June 7,

asking that an investigation be conducted into the trades, and that the next day, June 8, Wysenski

retired.

Plaintiff alleges that it is a plausible inference that Wysenski retired abruptly, and was

essentially pushed out by the company, in response to the unfavorable publicity concerning the

insider sales.  Defendants, however, respond that the most plausible inference is the simplest

one:  because Wysenski was separating from the company, she exercised options that might

otherwise expire within a relatively short time frame.  Defendants also contend that at least some

of Wysenski's sales were made pursuant to a Rule 10b5-1 plan.

As an initial matter, there is nothing unusual, or necessarily suspicious, about insider

sales during periods of rapid stock price increases.  It is commonplace for executives at publicly-traded companies to hold low-basis stock in the company or stock options with relatively low strike prices.  Stock options normally have exercise periods, which may be accelerated if the employer leaves the company.  *See Greebel*, 194 F.3d at 206.  Moreover, the portfolios of corporate insiders are often heavily weighted with the stock of the company.  It is hardly surprising that such executives have a strong incentive to cash out at least some portion of their holdings when prices are high.  *See Isham v. Perini Corp.*, 665 F. Supp. 2d 28, 38 (D. Mass. 2009) (even if allegation that insider sold all of his shares during class period supports an inference of scienter, "with respect to a motion to dismiss, 'even unusual sales by one insider do not give rise to a strong inference of scienter.'" (*quoting Biogen IDEC Inc.*, 537 F.3d at 56)).

It is undisputed that Wysenski retired on June 8 (or at least that her retirement was announced that day).  There is, however, an entirely plausible explanation for her exercise of options and sale of stock:  she was leaving the company.  "It is not unusual for individuals leaving a company, like [Wysenski], to sell shares.  Indeed, they often have a limited period of time to exercise their company stock options."  *Greebel*, 194 F.3d at 206.  If any inference of scienter can be drawn from Wysenski's stock sales, it is far from strong.  *See Lenartz v. American Superconductor Corp.*, 879 F. Supp. 2d 167, 186-87 (D. Mass. 2012) (retirement of individual defendant provides context for large sum of sales that tends to negate inference of scienter).[15]

---

[15] Defendants further contend that Wysenski's retirement had been planned for some time, and that at least some portion of her sales were made pursuant to an approved Rule 10b5-1 plan.  Whether those statements are true or not, they involve factual assertions outside the complaint, and therefore may not be considered at this stage.

Defendants likewise contend that seven of the ten trades (three by Boger, two by Mueller, and two of three by Wysenski) were made pursuant to Rule 10b5-1 plans.  (*See* Sylvia Aff. Ex. G, H, I).  Again, the Court cannot consider that evidence at this stage.

The trading behavior of Boger does not appear to be suspicious even in light of the chart provided by plaintiff.  Boger's sales appear to occur in consistent intervals in consistent amounts throughout 2012.  (*See* Compl. ¶ 38).[16]  Mueller apparently made two trades totaling $4 million in the relevant period, but there is no context other than plaintiff's conclusory allegation that the sales were "uncharacteristic of his trading pattern."  (Compl. ¶ 37).  And although Silva and Ullian both sold stock on May 9, 2012, the allegations of the complaint do not provide enough information to raise a strong inference that the sales are suspicious; among other things, the complaint contains no allegations as to how unusual the trades by Silva and Ullian were, in either the context of their total stock holdings or in the context of other sales they may have made in the past or future.  *See City of Dearborn*, 632 F.3d at 760-61 ("In calculating the percent of holdings sold, however, it is appropriate to consider not only the shares of stock that [defendants] held prior to their sales, but also the shares that they could have sold through the exercise of options, which plaintiff did not do."); *Greenbel*, 194 F.3d at 198 (explaining that the trading "must be unusual, well beyond the normal patterns of trading by those defendants").

There are thus plausible and nonculpable explanations for the insider sales.  *See Tellabs*, 551 U.S. at 324.  Indeed, as to many of the trades, there is a complete absence of any allegation, other than mere timing, that the trades were unusual and did not reflect normal trading patterns.  The trades by Wysenski, in particular, have an entirely plausible explanation.  Thus, while the allegations of insider trading no doubt add some weight to the claim of securities fraud, they are not sufficient to push the claim over the high bar set by Congress.

---

[16] According to defendants, Boger sold less than 2% of his holdings, which is not enough to raise a strong inference of scienter.  *See City of Dearborn*, 632 F.3d at 761 (holding that insider's sale of 4.82% of shares did not raise a strong inference of scienter).

23

In summary, the allegations of the complaint fail to create a "strong inference" of securities fraud, as required by law.  Accordingly, the motion to dismiss the claim under Rule 10b-5 will be dismissed.

**C.      Sections 20(a) and 20A**

Section 20(a) of the Exchange Act imposes joint and several liability on persons in control of entities that violate securities laws.  15 U.S.C. § 78t.  Section 20A of the Exchange Act provides that an insider who trades stock "while in possession of material, nonpublic information" is liable to any person who traded contemporaneously with the insider.  15 U.S.C. § 78t–1(a).  However, violations of Section 20(a) and 20A each depend on an underlying violation of the Exchange Act.  15 U.S.C. § 78t–1(a); *Waters*, 632 F.3d at 762 ("Because the plaintiff's Section 20(a) claim was derivative of the Rule 10b–5 claim, it was properly dismissed as well."); *ACA Fin. Guar. Corp.*, 512 F.3d at 67-68; *Carney v. Cambridge Tech. Partners, Inc.*, 135 F. Supp. 2d 235, 257 (D. Mass. 2001) ("To state a claim for insider trading, the plaintiffs must have adequately alleged a violation of the Exchange Act.").  Because no underlying securities violation exists here, the second and third counts of the amended complaint will be dismissed.

**IV.     Conclusion**

For the foregoing reasons, defendants' motion to dismiss is GRANTED.

**So Ordered.**

/s/ F. Dennis Saylor
F. Dennis Saylor IV
Dated: September 30, 2015                    United States District Judge